## WALDECKER v. SMITH.

1. SALES—COMPLETION AND ACCEPTANCE—EVIDENCE.
    In an action to recover the agreed price for making and constructing a pattern for a certain sheet-metal cutting machine, evidence *held*, insufficient to show that the pattern was completed according to contract when delivered to defendant.

2. SAME.
    Where a casting company had, at defendant's request, taken the pattern to its shop for the purpose of casting the machines, *held*, that the evidence showed that such company had no authority from defendant to accept such pattern as complying with the contract between plaintiff and defendant.

Error to Wayne; Stevens, J., presiding. Submitted April 3, 1917. (Docket No. 21.) Decided June 27, 1917.

Assumpsit in justice's court by John P. Waldecker against H. Collier Smith for goods sold and delivered. There was judgment for defendant, and plaintiff appealed to the circuit court. Judgment for plaintiff.

Defendant brings error. Reversed, and no new trial ordered.

*Zimmer & Chidester*, for appellant.

*James J. Spillane*, for appellee.

MOORE, J. The defendant is engaged in manufacturing machinery for cutting sheet metal. These machines comprise a U-shaped main casting; on the front end of each are mounted revolving disc cutters. The construction of these machines requires a steel casting. To make these castings there must be a pattern. Defendant entered into a verbal contract with the plaintiff to make and construct a pattern for $100, to be completed in eight days. It was to be a first-class job as to material and workmanship. The Michigan Grey Iron Casting Company was doing casting for the defendant, and at his request picked up the pattern and carried it to the foundry. One imperfect casting was made from the pattern. It was claimed to be improperly made, and was taken back to the shop of the plaintiff, who did other work on it, which plaintiff claims made it perfect; but defendant claims it never was properly completed, and he refused to pay for it. At the time of the trial the pattern was in the possession of the plaintiff.

Suit was commenced in the justice's court, where the declaration was on all the common counts in assumpsit. The plea was the general issue, with notice of recoupment. From a judgment in favor of the defendant, the plaintiff appealed the case to the circuit court. Defendant moved for a directed verdict. This the court declined to do, and a jury returned a verdict for the plaintiff in the sum of $107.89. A motion was made for a new trial, which was refused upon condition that plaintiff remit $25, which the evidence showed was the cost of making repairs on the one

casting made from the pattern. Plaintiff's counsel at once notified counsel of defendant of his election to remit that amount, so that the amount involved here is $82.89. The case is here by writ of error.

Counsel for appellant group his assignments of error as follows:

(1) That no recovery could be had under the common counts in assumpsit.

(2) Errors in refusal to dismiss, because plaintiff was using assumed name without showing compliance with the statute.

(3) Errors in the admission in evidence of plaintiff's Exhibit 1.

(4) That the court erred in its charge as indicated.

(5) That the court erred in its findings of fact as indicated.

(6) That the defendant's motion for new trial should have been granted.

The court was of the opinion that there was some evidence the pattern had been completed and accepted, and for that reason a recovery might be had upon the common counts in assumpsit. We think this was too favorable a construction to put upon the evidence offered on behalf of the plaintiff. There is no doubt that defendant was in need of the pattern, and authorized the Michigan Grey Iron Casting Company to call for it when it was completed and take it to their foundry to be used to make castings, and that it was called for by that company. The plaintiff was not a witness, but his brother, who had charge of the business, was a witness for him. In his testimony appears the following:

"On the 12th of February they took the pattern to the other place; I was present when it left the shop; helped to load it.

"Q. Was the pattern complete at that time? .

"A. Yes, sir.

"Q. Did it have wrapping plates?

"A. That was the only thing it did not have; otherwise, it was complete.

"*Q.* It is a very large heavy pattern?

"*A.* Yes, sir.

"*Q.* I will ask you if wrapping plates are not necessary for patterns of that size?

"*A.* Yes, sir; they are. They were not on when the pattern left the shop. I next saw the pattern about ten days later at the Michigan Grey Iron Company's foundry.

"*Q.* Did you bring it back to your shop?

"*A.* Yes.

"*Q.* For what purpose?

"*A.* We had a few little changes—few little repairs on it.

"*Q.* Which did you mean, changes or repairs?

"*A.* Repairs.

"*Q.* What was the condition when you found it?

"*A.* Why, there were a few pieces broken off. Wasn't very many. They were put on in a short time. Wouldn't say that it was a poor job. The core box is about 6x7 feet. In using it for making the casting, the core box is filled with sand; would weigh in my best judgment about 1,200 pounds. After the core box is filled with sand, it is necessary to invert it—turn it over.

"*Q.* I will ask you if that box wasn't so poor and weakly constructed that, in attempting to turn it over, it went to pieces?

"*A.* There was some pieces came off; yes.

"*Q.* In getting it back in shape, you attempted to strengthen it by putting some 2x4's on it, did you not?

"*A.* We did not attempt it—we did straighten and strengthen it. That was after it was sent to the Michigan Grey Iron Company. * * *

"*Q.* The pattern proper, as distinguished from the core box, pulled apart when it was pulled out of the sand, did it not?

"*A.* A few pieces came off.

"*Q.* You did reconstruct that?

"*A.* Yes, sir.

"*Q.* Did you strengthen it?

"*A.* The pattern; yes, sir. Since the work was done on it, Mr. Smith has seen it several times.

"*Q.* He has absolutely refused to accept it, has he not?

"*A.* Yes; after his man, who was superintending the place, accepted it, he himself refused to accept it. He said his reason for it was it was not made in accordance with the contract. There was no contract on this job.

"*Q.* He complained that it was not made out of material of sufficient strength?

"*A.* Yes, sir.

"*Q.* You know he has complained that it was not made in a workmanlike manner?

"*A.* Not to my knowledge; I did not hear him say that.

"*Q.* You know that he has complained that it was not a first-class job?

"*A.* Yes.

"*Q.* He has refused to pay for it?

"*A.* Yes.

"*Q.* It is still in your shop?

"*A.* Yes."

The foundryman was a witness for the plaintiff. His version on cross-examination of what occurred when the pattern was used is in part as follows:

"Our company picked up this pattern and carried it to our place of business, as is usual in matters of this kind. We had an order from Mr. Smith to make the casting according to the pattern. In attempting to make this casting, the core box pulled apart.

"*Q.* I will ask you if it wasn't a very flimsy construction?

"*A.* Yes, it was. The material in it was very light for a box of that size.

"*Q.* I will ask you if the workmanship was poor; that is, the joints were bad, and not made in a strong manner?

"*A.* The material in the box was not heavy enough for the amount of sand we had to actually put in, with the result we had some trouble. A box of that size carries approximately 1,200 or 1,500 pounds. The sand is placed in the core box and rammed; the box has to stand up under a lot of weight, because the sand is pounded in, so the core box must stand all the ramming, in addition to the weight, and then the box must be inverted.

"*Q.* In inverting this particular core box, you pulled it to pieces?

"*A.* Yes.

"*Q.* What was the result of that upon the mold?

"*A.* It amounted to a day's delay in getting the core; it took about a day to fix the core box.  *  *  * The core raised, and we had a defect in the casting.  The men in our foundry spent time, probably the whole day, filing the core before they could use it. *  *  *

"*Q.* As a matter of fact, if the pattern and core box were both made correctly, there would not be any necessity for filing, would there?

"*A.* No; I don't know where—

"*Q.* Answer the question; that is all I want.

"*A.* No.

"*Q.* When this casting came out, as a matter of fact, one wall was very thick, wasn't it?

"*A.* Yes; the core raised, and naturally one wall would be thin and the other heavy.

"*Q.* Did the pattern itself—the pattern proper, as distinguished from the core box—break up when it was pulled out of the sand?

"*A.* Pulled a section off of it.

"*Q.* It was the section that projected from the bottom?

"*A.* Yes; they had it hooked on where they really should not have had it hooked on.

"*Q.* Where is the place where the wrapping plates should be?

"*A.* The wrapping plates are on the main body of the pattern, where it has lots of strength."

So far I have quoted wholly from the testimony offered by the plaintiff.  The defendant offered testimony to the effect that the pattern was never completed, that he had never accepted it, or authorized any one to accept it, and that from the first he had refused to pay for it.

Giving the testimony offered by the plaintiff the most favorable construction possible, it shows that the foundry company had no authority from Mr. Smith, except to call for a completed pattern, and that the

pattern which was delivered to them was not a completed pattern of good workmanship, and that there has been no authorized acceptance by Mr. Smith of the pattern which was made. Irrespective of the question of pleadings, in any phase of the case there should have been a directed verdict in favor of defendant, with costs to defendant.

The case is reversed, and, as it is not likely a different showing could be truthfully made, no new trial will be granted.

KUHN, C. J., and STONE, OSTRANDER, BIRD, STEERE, BROOKE, and FELLOWS, JJ., concurred.